IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| ZEESHAN CHOUDHRY, | ) | CIVIL ACTION NO. |
| Plaintiff(s) | ) | |
| v. | ) | COMPLAINT |
| | ) | JURY TRIAL DEMANDED |
| BMW OF SOUTHPOINT DURHAM NC OWNED BY HENDRICK AUTOMOTIVE GROUP CHARLOTTE NC | ) | |
| Defendant(s) | | |

## NATURE OF ACTION

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices based on race and to provide appropriate relief to aggrieved individuals who were harmed by such practices (aggrieved individuals). As alleged with greater particularity in the paragraphs below, Plaintiff ZEESHAN CHOUDHRY ("Plaintiff") alleges BMW of Southpoint Durham NC owned by Hendrick Automotive Group Charlotte NC ("Defendant"), failed to hire, refer, select, place, or assign Asian American applicants for positions at its warehouse facilities in . further discriminated against Asian American workers by segregating workers based on race and terminating Asian American workers based on race at its facilities.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3) (Title VII) and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The unlawful employment practices alleged in this Complaint were committed within the jurisdiction of the United States District Court for the Middle District of North Carolina, Durham Division. Venue is appropriate for this Court.

**PARTIES**

3. Plaintiff, the ZEESHAN CHOUDHRY ("Plaintiff"), is the agency of the United States charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1).

4. Defendant BMW of Southpoint Durham NC owned by Hendrick Automotive Group Charlotte NC ("Defendant") is vehicle dealership, headquartered in Charlotte, North Carolina and specializing in vehicle sales services.

5. Defendant has service locations Durham, North Carolina.

6. Defendant exercised control over its temporary workforce.

7. Defendant recruited, screened, and hired its workforce.

8. Defendant disciplined and discharged employees.

9. Defendant issued paychecks to workers.

10. At all relevant times, Defendant decided who worked and who did not work.

11. Defendant held responsibility for bodily injury and any workers' compensation injuries.

12. Defendant directed the work schedules and tracked overtimes.

13. Defendant set the pay for its employees.

14. Defendant has continuously been doing business in the State of North Carolina and the City of Durham and has continuously had at least 15 employees.

15. At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g)

and (h).

## ADMINISTRATIVE PROCESS

16. All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF CLAIMS

### Count I

**Defendant Discriminated Against Plaintiff based on his Asian American Race in Violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981)**

17. Since at least on or around January 2018, Defendant engaged in unlawful employment practices at its locations in violation of Section 1981 of the Civil Rights Act of 1866 42 U.S.C. § 1981.

18. The unlawful employment practices include an ongoing pattern or practice by of failing to hire, select, refer, or place Asian American applicants into positions at Defendant's client companies because of their race.

19. Plaintiff began his employment with Hendrick approximately twenty (20) years ago and, at the time of the events described below, held the position of General Sales Manager.

20. Throughout his twenty (20) years of service, Plaintiff maintained a flawless work history and was compensated at an annual salary exceeding $300,000, reflecting his status as a high-performing, senior manager.

21. Approximately one year before the events described in this Complaint, a new administration assumed control of the dealership.

22. Upon information and belief, the new administration's principal objective was to reduce operating expenses, including by eliminating high-earning managers such as Plaintiff.

23. In or about [MONTH/YEAR], Hendrick received a vehicle in connection with a

dealer trade. A driver purporting to represent a transport company arrived at the dealership to pick up the vehicle.

24. Plaintiff interacted with the driver for approximately two (2) minutes, asking for the vehicle's VIN in order to determine its stock number.

25. Plaintiff then announced aloud to his manager that the transporter had arrived to pick up the identified stock number.

26. The manager who had initiated the dealer trade several days earlier, and who had full knowledge of the transaction, stated that he was aware of the specific vehicle being picked up, that he would assist, and that he assumed responsibility for assisting the transporter.

27. Several days later, it was discovered that the vehicle had been stolen and that the transport job had been compromised by the dispatch company, and that the transport company that took the vehicle had not been retained by the dealer that was to receive it.

28. Although the new car sales manager had initiated the dealer trade, had full knowledge of the transaction, and was primarily involved in the events that led to the vehicle's theft, Hendrick imposed no suspension, demotion, or other discipline on that manager. Instead, Hendrick designated that manager as the lead manager, a fact communicated to Plaintiff by the general manager.

29. By contrast, Hendrick suspended Plaintiff for eight (8) days and thereafter demoted him from General Sales Manager to desk manager with a significant reduction in pay, purportedly on account of the dealer-trade incident, notwithstanding Plaintiff's minimal, two-minute involvement.

30. As a result of the demotion, Plaintiff was required to report to a former subordinate and was presented with a new, lower pay plan that Plaintiff did not sign, accept, or agree to, yet Plaintiff continued to be assigned duties beyond those of a desk manager.

31. Plaintiff was subjected to harassment by Hendrick's Human Resources Manager. Among other things, the HR Manager sent Plaintiff an email at approximately 8:30 p.m. on the Saturday of Memorial Day weekend, denied Plaintiff's request for a few additional days to review the matter while Plaintiff sought legal assistance, sent Plaintiff emails at approximately 2:30 a.m., and escalated the correspondence by copying the company's Vice President.

32. On or about Wednesday, May 27, 2026, Hendrick issued a termination notice to Plaintiff, falsely classifying his recent absences as a "voluntary separation" and "job abandonment," and immediately disabled and blocked Plaintiff's access to his corporate email and company systems.

33. Hendrick's stated reasons for suspending, demoting, and terminating Plaintiff are false and pretextual. The dealer-trade incident was a pretext to remove a high-earning manager, as demonstrated by Hendrick's decision to discipline and ultimately terminate Plaintiff, who had only minimal involvement, while promoting the manager who initiated and was primarily responsible for the transaction.

34. Upon information and belief, Plaintiff was treated less favorably than the comparator manager, and than other similarly situated Hendrick employees, because of Plaintiff's race, and but for Plaintiff's race he would not have been suspended, demoted, subjected to a reduction in pay, or terminated. [ALLEGE RACE OF COMPARATOR MANAGER AND ANY ADDITIONAL FACTS SUPPORTING RACIAL MOTIVATION — CLIENT TO PROVIDE.]

35. As a direct and proximate result of Hendrick's conduct, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, loss of earning capacity, emotional distress, and other harm.

36. The effect of the practices complained of in Paragraphs 20 through 44 affected the terms of Asian Americans' employment as they were denied job opportunities because of their

race.

37. The unlawful employment practices described above disproportionately exclude Asian American employees from employment and constitute a pattern or practice of discrimination against Asian American employees based on race.

38. The effect of the practices complained of in the above Paragraphs 20 through 44 has been to deprive a group of aggrieved individuals, consisting of Asian American applicants and employees, of equal employment opportunities and otherwise adversely affect their status as applicants and employees because of their race.

39. The unlawful employment practices complained of in the Paragraphs 20 through 44 above were and are intentional.

40. The unlawful employment practices complained of in the Paragraphs 20 through 44 above were and are done with malice or with reckless indifference to the federally protected rights of the aggrieved individuals.

41. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

42. At all relevant times, Plaintiff had an employment relationship with Hendrick that constituted a contractual relationship protected by 42 U.S.C. § 1981, which guarantees all persons the same right to make, perform, modify, enforce, and enjoy the benefits, privileges, terms, and conditions of contracts as is enjoyed by white citizens.

43. Hendrick intentionally discriminated against Plaintiff on the basis of hisrace by suspending, demoting, reducing the pay of, and otherwise altering the terms and conditions of Plaintiff's employment, while treating a similarly situated employee outside Plaintiff's protected class more favorably.

44. But for Plaintiff's race, Hendrick would not have suspended, demoted, reduced the

pay of, or otherwise interfered with Plaintiff's contractual employment relationship.

45. As a direct and proximate result of Hendrick's unlawful discrimination, Plaintiff has suffered damages, including past and future lost wages and benefits, emotional distress, and the costs of bringing this action, and Hendrick's intentional and malicious conduct entitles Plaintiff to punitive damages.

## Count II

**Defendant Discriminated Against Asian American Employees by Segregating Them and Placing them in Less Desirable and Lower-Paying Positions**
**Retaliation in Violation of the Civil Rights Act of 1866**
**(42 U.S.C. § 1981)**

46. Since at least January 2018, Defendant engaged in unlawful employment practices at its locations in in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) and Title I of the Civil Rights Act of 1991.

47. The unlawful employment practices include an ongoing pattern or practice by of segregating Asian American employees by placing them into less desirable and lower-paying positions at Defendant because of their race.

48. Plaintiff began hisemployment with Hendrick approximately twenty (20) years ago and, at the time of the events described below, held the position of General Sales Manager.

49. Throughout histwenty (20) years of service, Plaintiff maintained a flawless work history and was compensated at an annual salary exceeding $300,000, reflecting hisstatus as a high-performing, senior manager.

50. Approximately one year before the events described in this Complaint, a new administration assumed control of the dealership. Upon information and belief, the new administration's principal objective was to reduce operating expenses, including by eliminating high-earning managers such as Plaintiff.

51. In or about [MONTH/YEAR], Hendrick received a vehicle in connection with a

dealer trade. A driver purporting to represent a transport company arrived at the dealership to pick up the vehicle.

52. Plaintiff interacted with the driver for approximately two (2) minutes, asking for the vehicle's VIN in order to determine its stock number. Plaintiff then announced aloud to hismanager that the transporter had arrived to pick up the identified stock number.

53. The manager who had initiated the dealer trade several days earlier, and who had full knowledge of the transaction, stated that he was aware of the specific vehicle being picked up, that he would assist, and that he assumed responsibility for assisting the transporter.

54. Several days later, it was discovered that the vehicle had been stolen and that the transport job had been compromised by the dispatch company, and that the transport company that took the vehicle had not been retained by the dealer that was to receive it.

55. Although the new car sales manager had initiated the dealer trade, had full knowledge of the transaction, and was primarily involved in the events that led to the vehicle's theft, Hendrick imposed no suspension, demotion, or other discipline on that manager. Instead, Hendrick designated that manager as the lead manager, a fact communicated to Plaintiff by the general manager.

56. By contrast, Hendrick suspended Plaintiff for eight (8) days and thereafter demoted him from General Sales Manager to desk manager with a significant reduction in pay, purportedly on account of the dealer-trade incident, notwithstanding Plaintiff's minimal, two-minute involvement.

57. As a result of the demotion, Plaintiff was required to report to a former subordinate and was presented with a new, lower pay plan that Plaintiff did not sign, accept, or agree to, yet Plaintiff continued to be assigned duties beyond those of a desk manager.

58. Plaintiff was subjected to harassment by Hendrick's Human Resources Manager.

Among other things, the HR Manager sent Plaintiff an email at approximately 8:30 p.m. on the Saturday of Memorial Day weekend, denied Plaintiff's request for a few additional days to review the matter while Plaintiff sought legal assistance, sent Plaintiff emails at approximately 2:30 a.m., and escalated the correspondence by copying the company's Vice President.

59. On or about Wednesday, May 27, 2026, Hendrick issued a termination notice to Plaintiff, falsely classifying hisrecent absences as a "voluntary separation" and "job abandonment," and immediately disabled and blocked Plaintiff's access to hiscorporate email and company systems.

60. Hendrick's stated reasons for suspending, demoting, and terminating Plaintiff are false and pretextual. The dealer-trade incident was a pretext to remove a high-earning manager, as demonstrated by Hendrick's decision to discipline and ultimately terminate Plaintiff — who had only minimal involvement — while promoting the manager who initiated and was primarily responsible for the transaction.

61. Upon information and belief, Plaintiff was treated less favorably than the comparator manager, and than other similarly situated Hendrick employees, because of Plaintiff's race, and but for Plaintiff's race he would not have been suspended, demoted, subjected to a reduction in pay, or terminated. [ALLEGE RACE OF COMPARATOR MANAGER AND ANY ADDITIONAL FACTS SUPPORTING RACIAL MOTIVATION — CLIENT TO PROVIDE.]

62. As a direct and proximate result of Hendrick's conduct, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, loss of earning capacity, emotional distress, and other harm.

63. The effect of the practices complained of in Paragraphs 50 through 80 affected the terms of Asian Americans' employment as they were unlawfully segregated because of their race.

64. The unlawful employment practices described above in Paragraphs 50 through 80

disproportionately exclude Asian American employees from equal employment and constitute a pattern or practice of discrimination against Asian American employees based on race.

65. The effect of the practices complained of in the above Paragraphs 50 through 80 has been to deprive a group of aggrieved individuals, consisting of Asian American applicants and employees, of equal employment opportunities and otherwise adversely affect their status as applicants and employees because of their race.

66. The unlawful employment practices complained of in the above Paragraphs 50 through 80 were and are intentional.

67. The unlawful employment practices complained of in the above Paragraphs 50 through 80 were and are done with malice or with reckless indifference to the federally protected rights of the aggrieved individuals.

68. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

69. Plaintiff engaged in protected activity by opposing conduct he reasonably and in good faith believed to constitute race discrimination in the making, performance, and enjoyment of hisemployment contract, as protected by 42 U.S.C. § 1981.

70. Hendrick retaliated against Plaintiff for that protected activity by issuing a termination notice, falsely characterizing hisseparation as voluntary abandonment, and cutting off hisaccess to company systems.

71. But for Plaintiff's protected activity, Hendrick would not have taken these adverse actions. As a direct and proximate result, Plaintiff has suffered damages, including past and future lost wages and benefits and emotional distress, and Hendrick's intentional and malicious conduct entitles Plaintiff to punitive damages.

**Count III**

**Defendant Discriminated Against Asian American Employees by Terminating them because of their Race**
**Discriminatory Discharge in Violation of the Civil Rights Act of 1866**
**(42 U.S.C. § 1981)**

72. Since at least January 2018, Defendant engaged in unlawful employment practices at its locations in in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) and Title I of the Civil Rights Act of 1991.

73. The unlawful employment practices include an ongoing pattern or practice of terminating Asian Americans at a disproportionally higher rate than non-Asian American employees because of their race.

74. Plaintiff began hisemployment with Hendrick approximately twenty (20) years ago and, at the time of the events described below, held the position of General Sales Manager.

75. Throughout histwenty (20) years of service, Plaintiff maintained a flawless work history and was compensated at an annual salary exceeding $300,000, reflecting hisstatus as a high-performing, senior manager.

76. Approximately one year before the events described in this Complaint, a new administration assumed control of the dealership. Upon information and belief, the new administration's principal objective was to reduce operating expenses, including by eliminating high-earning managers such as Plaintiff.

77. In or about [MONTH/YEAR], Hendrick received a vehicle in connection with a dealer trade. A driver purporting to represent a transport company arrived at the dealership to pick up the vehicle.

78. Plaintiff interacted with the driver for approximately two (2) minutes, asking for the vehicle's VIN in order to determine its stock number. Plaintiff then announced aloud to hismanager that the transporter had arrived to pick up the identified stock number.

79. The manager who had initiated the dealer trade several days earlier, and who had full knowledge of the transaction, stated that he was aware of the specific vehicle being picked up, that he would assist, and that he assumed responsibility for assisting the transporter.

80. Several days later, it was discovered that the vehicle had been stolen and that the transport job had been compromised by the dispatch company, and that the transport company that took the vehicle had not been retained by the dealer that was to receive it.

81. Although the new car sales manager had initiated the dealer trade, had full knowledge of the transaction, and was primarily involved in the events that led to the vehicle's theft, Hendrick imposed no suspension, demotion, or other discipline on that manager. Instead, Hendrick designated that manager as the lead manager, a fact communicated to Plaintiff by the general manager.

82. By contrast, Hendrick suspended Plaintiff for eight (8) days and thereafter demoted him from General Sales Manager to desk manager with a significant reduction in pay, purportedly on account of the dealer-trade incident, notwithstanding Plaintiff's minimal, two-minute involvement.

83. As a result of the demotion, Plaintiff was required to report to a former subordinate and was presented with a new, lower pay plan that Plaintiff did not sign, accept, or agree to, yet Plaintiff continued to be assigned duties beyond those of a desk manager.

84. Plaintiff was subjected to harassment by Hendrick's Human Resources Manager. Among other things, the HR Manager sent Plaintiff an email at approximately 8:30 p.m. on the Saturday of Memorial Day weekend, denied Plaintiff's request for a few additional days to review the matter while Plaintiff sought legal assistance, sent Plaintiff emails at approximately 2:30 a.m., and escalated the correspondence by copying the company's Vice President.

85. On or about Wednesday, May 27, 2026, Hendrick issued a termination notice to

Plaintiff, falsely classifying hisrecent absences as a "voluntary separation" and "job abandonment," and immediately disabled and blocked Plaintiff's access to hiscorporate email and company systems.

86. Hendrick's stated reasons for suspending, demoting, and terminating Plaintiff are false and pretextual. The dealer-trade incident was a pretext to remove a high-earning manager, as demonstrated by Hendrick's decision to discipline and ultimately terminate Plaintiff — who had only minimal involvement — while promoting the manager who initiated and was primarily responsible for the transaction.

87. Upon information and belief, Plaintiff was treated less favorably than the comparator manager, and than other similarly situated Hendrick employees, because of Plaintiff's race, and but for Plaintiff's race he would not have been suspended, demoted, subjected to a reduction in pay, or terminated. [ALLEGE RACE OF COMPARATOR MANAGER AND ANY ADDITIONAL FACTS SUPPORTING RACIAL MOTIVATION — CLIENT TO PROVIDE.]

88. As a direct and proximate result of Hendrick's conduct, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, loss of earning capacity, emotional distress, and other harm.

89. The effect of the practices complained of in Paragraphs 86 through 105 affected the terms of Asian Americans' employment as they were unlawfully terminated because of their race.

90. The unlawful employment practices described above disproportionately exclude Asian American employees from equal employment and constitute a pattern or practice of discrimination against Asian American employees based on race.

91. The effect of the practices complained of in the above Paragraphs 86 through105 has been to deprive a group of aggrieved individuals, consisting of Asian American applicants and employees, of equal employment opportunities and otherwise adversely affected their status as

employees because of their race.

92. The unlawful employment practices complained of in the above Paragraphs 86 through 105 were and are intentional.

93. The unlawful employment practices complained of in the above Paragraphs 86 through 105 were and are done with malice or with reckless indifference to the federally protected rights of the aggrieved individuals.

94. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

95. Hendrick intentionally terminated Plaintiff's employment contract because of hisrace, thereby interfering with Plaintiff's right under 42 U.S.C. § 1981 to the making, performance, enjoyment, and non-discriminatory termination of hiscontractual employment relationship.

96. But for Plaintiff's race, Hendrick would not have terminated hisemployment. Hendrick retained and promoted a similarly situated employee outside Plaintiff's protected class under materially similar circumstances.

97. As a direct and proximate result of the discriminatory discharge, Plaintiff has suffered damages, including past and future lost wages and benefits and emotional distress, and Hendrick's intentional and malicious conduct entitles Plaintiff to punitive damages.

**COUNT IV**
**Wrongful Discharge in Violation of North Carolina Public Policy**
**(N.C. Gen. Stat. § 143-422.2)**

98. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

99. It is the established public policy of the State of North Carolina, as declared in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2, to protect and

safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination on account of race by employers that regularly employ fifteen (15) or more employees.

100. Hendrick regularly employs fifteen (15) or more employees and is subject to the public policy declared in N.C. Gen. Stat. § 143-422.2.

101. Although Plaintiff's employment was at-will, Hendrick had no right to terminate that employment for an unlawful reason that contravenes North Carolina public policy. Hendrick discharged Plaintiff because of hisrace, in contravention of the public policy expressed in N.C. Gen. Stat. § 143-422.2.

102. As a direct and proximate result of hiswrongful discharge in violation of North Carolina public policy, Plaintiff has suffered damages, including lost wages and benefits, emotional distress, and other harm, and is entitled to compensatory and punitive damages.

**COUNT V**
**Negligent Infliction of Emotional Distress**
**(North Carolina Common Law)**

103. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

104. Hendrick, through its managers, supervisors, and Human Resources personnel, owed Plaintiff a duty of reasonable care and negligently engaged in conduct toward Plaintiff, including in the manner in which it investigated the dealer-trade incident, imposed discipline, and communicated with Plaintiff.

105. It was reasonably foreseeable that Hendrick's negligent conduct would cause Plaintiff severe emotional distress.

106. Hendrick's negligent conduct in fact caused Plaintiff to suffer severe emotional distress.

107. As a direct and proximate result of Hendrick's negligence, Plaintiff has suffered and continues to suffer severe emotional distress and related damages.

**COUNT VI**
**Negligent Hiring, Retention, and Supervision**
**(North Carolina Common Law)**

108. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

109. Hendrick employed the managers, supervisors, and Human Resources personnel who committed the tortious and unlawful acts against Plaintiff described in this Complaint.

110. Those employees were incompetent or unfit to perform their duties without engaging in tortious and unlawful conduct, and Hendrick knew or, in the exercise of reasonable care, should have known of their unfitness prior to the acts complained of.

111. Hendrick negligently hired, retained, and supervised those employees, and its failure to exercise reasonable care in doing so proximately caused injury to Plaintiff.

112. As a direct and proximate result of Hendrick's negligent hiring, retention, and supervision, Plaintiff has suffered and continues to suffer damages.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff requests that this Court:

A. Grant a permanent injunction enjoining Defendant , its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from discriminating against Asian American candidates for employment and current Asian American workers because of their race.

B. Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for all aggrieved individuals, and which eradicate the effects of their past and present unlawful employment practices.

C. Order Defendant to make whole all aggrieved individuals by providing appropriate backpay with prejudgment interest in amounts to be determined at trial and other affirmative relief necessary to eradicate the effects of their unlawful employment practices, including, but not limited to, reinstatement or awarding them front pay.

D. Order Defendant to make whole all aggrieved individuals by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in the paragraphs above, in amounts to be determined at trial.

E. Order Defendant to make whole all aggrieved individuals by providing compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of in the paragraphs above, including emotional pain and suffering, humiliation, inconvenience, and loss of enjoyment of life, in amounts to be determined at trial.

F. Order Defendant to pay all aggrieved individuals punitive damages for their malicious and reckless conduct, as described in the paragraphs above, in amounts to be determined at trial.

G. Require Defendant , their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them to maintain all employment records required by law.

H. Grant such further relief as the Court deems necessary and proper in the public interest.

I. Award the Plaintiff its costs of this action.

**JURY TRIAL DEMAND**

The Plaintiff requests a jury trial on all questions of fact raised by its complaint.

Respectfully submitted,

**B.K. LEONARD LAW FIRM**

_/s/ Brian K. Leonard_
Brian K. Leonard
Attorney for Plaintiff
N.C.S.B. No. 38308
11010 Lake Grove Blvd., Unit 100-425
Morrisville, NC 27560
Telephone: 984-212-7737
bleonard@civilrightsappellatelawyer.com